SCHOTT (MASSEY v.). See Case No. 9,-262.

SCHOYER (UNITED STATES v.). See Cases Nos. 16,232 and 16,232a.

## Case No. 12,480.

### SCHRENKEISEN v. MILLER.

[9 Ben. 55.] [1]

District Court, S. D. New York. March, 1877.

BANKRUPTCY—ILLEGAL TRANSFER OF PROPERTY—ORDINARY COURSE OF BUSINESS.

1. S., who was a manufacturer of chairs, bought of H. a quantity of black walnut logs, to be used in his business. and gave H. his note for them for $2,242.59, dated November 17, 1875, payable in three months. On December 4, 1875, S. failed to pay a note due that day. On December 9, 1875, S. sent a message to M. that there were some logs for sale. M. went to S. and bought of him 67 of the logs which S. had bought of H., agreeing to pay for them $1,057.17 in four months. On the 16th of December S. was adjudged a bankrupt on his own petition, and an assignee was appointed. On December 10th M. took from H. a transfer of the note of S. for $2,242.59, without recourse to H., and he afterwards filed a proof of debt in the bankruptcy proceedings for the amount of that note, less the $1,057.17 which he had agreed to pay for the logs, and was paid a dividend on it. The assignee filed a bill in equity against M. to set aside the transfer of the logs from S. to M. as void, alleging that S. was insolvent when it was made, and that M., when he bought the logs, had reasonable cause to believe that S. was insolvent. or acting in contemplation of insolvency, and that the sale was made by S. with a view to prevent his property from coming to his assignee in bankruptcy, and to prevent it from being distributed under the bankruptcy statute, and so defeat the object of, and impair. hinder. impede and delay the operation and effect of, such statute; and that the sale was not made in the usual and ordinary course of the business of S., and was void and a fraud on the bankruptcy act [of 1867 (14 Stat. 517)]. The answer of M. denied that he knew that S. was insolvent or in contemplation of insolvency. The case was heard on pleadings and proofs. *Held*, that the sale to M. was not one in the usual and ordinary course of the business of S., as that was known to M.; that the burden, therefore, was thrown on M., of showing that there was no violation of section 5129 of the Revised Statutes; and that he had not done this.

2. The plaintiff had made out a case falling within the decision in Walbrun v. Babbitt, 16 Wall. [83 U. S.] 577.

3. S. intended a fraud. in the sense of section 5130 of the Revised Statutes. in the sale to M.

4. There was enough in the facts to put M. on inquiry to ascertain the condition of the affairs of S.

5. The point, that the plaintiff should have proceeded by a suit at law and not by bill in equity, had not been taken in the answer and was, therefore, waived; but, if it had been

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

[1] [Reported by Robert D. Benedict. Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

taken, it could not have prevailed, for, when a transfer of property is held void under the provisions of the bankruptcy act, as against the assignee in bankruptcy, the transferee is properly to be regarded as a trustee for the assignee, and to be held to account as such.

6. The plaintiff was entitled to a decree that the sale to M. was void and that M. account for the property.

[This was a bill by Martin Schrenkeisen, assignee in bankruptcy of Alexander Stein, against John Miller.]

Daily & Machin, for plaintiff.
Castner & Love, for defendant.

BLATCHFORD, District Judge. Alexander Stein filed his petition in voluntary bankruptcy, in this court, on the 16th of December, 1875, and was adjudicated a bankrupt, and the plaintiff was appointed his assignee. Stein was a manufacturer of chairs and was in the habit of purchasing logs of black walnut wood, and using them in his business, by cutting them up and making them into chairs. In November, 1875, he purchased 99 of such logs from one Hoyt, and gave to Hoyt, for the purchase price thereof, his promissory note, dated November 17, 1875, payable three months after date to the order of Hoyt, for $2,242.59. On the 9th of December, 1875, Stein had on hand sixty-seven of such logs, and on that day contracted to sell those sixty-seven logs to the defendant, Miller, for $1,057.17. Miller was to pay Stein for the logs in four months. The logs were delivered to Miller. On the 10th of December, 1875, Miller took from Hoyt a transfer in writing, to him, Miller, of all the right, title and interest of Hoyt in the note for $2,242.59, expressed to be without recourse to Hoyt, and written on the back of the note. The note and the transfer were on the same day delivered to Miller. Miller did not pay Stein for the logs or give him a note; but, after the adjudication in bankruptcy, he filed a proof of debt against the estate of Stein, founded on the note for $2,242.59, as owned by him, Miller, for the amount of that note less the $1,057.17 he owed for the 67 logs. It also appears that he has been paid a dividend from the estate on the amount proved.

The bill in this case alleges, that, on and from the 9th of December, 1875, Stein was insolvent; that Miller, when he purchased the logs, had reasonable cause to believe that Stein was insolvent, or was acting in contemplation of insolvency, and knew that the sale was made by Stein with a view to prevent his property from coming to his assignee in bankruptcy, and to prevent it from being distributed under the bankruptcy statute, and to defeat the object of, and impair, hinder, impede and delay the operation and effect of, such statute; that said sale was not made in the usual and ordinary course of the business of Stein; that Stein sold the logs at much less than their regular market price; that Hoyt and Miller, with the intent to enable Hoyt to obtain a preference over the general body of the creditors of Stein, agreed that the note for $2,242.-

59 should be assigned by Hoyt to Miller, and that Miller should offset the amount he agreed to pay Stein for the logs, and prove the claim for the balance of the note; and that, by reason of the premises, the transfer of the logs by Stein to Miller was and is void, and was and is a fraud on the bankruptcy statute and on the general body of the creditors of Stein. The bill prays for a decree that Miller restore to the plaintiff the 67 logs, the value of which is alleged to be $1,409.58, or so many of the same as he still has, and pay to the plaintiff the value of those which he no longer has.

The answer denies that Miller was advised of or knew that Stein was insolvent or in contemplation of insolvency, and alleges that he had the assurances of Stein and one representing himself to be the agent of Stein, that Stein was in a sound financial condition.

Stein had been a manufacturer of chairs at the same place for twenty-four years. His property consisted of real estate, machinery, lumber, cut up lumber and logs. He had purchased the 99 logs from Hoyt with a view to cut them up and use them in his business, and not with a view to sell them again in the shape of logs. He agreed to pay $55 per one thousand feet for the logs. They were delivered to him from time to time for a month after he contracted for them and gave the note for $2,242.59 to Hoyt for the purchase price of them. Stein testifies, that he became insolvent and unable to pay his debts in the ordinary course, as they matured, on the 4th of December, 1875, and on that day failed to pay a promissory note which became due on that day. On the 9th of December the defendant received a message from Stein that there were some logs for sale. Miller, on going to Stein's place of business in response to such message, saw one Zimmer there, before seeing Stein, and saw that Zimmer was assuming to be in charge of the place. Zimmer kept a drinking saloon, and Miller knew that fact. Miller had previously sold logs to Stein, and had never bought logs of Stein. He knew what Stein's business was.

As to what transpired between Stein and Miller, Stein testifies, that he told Miller that he could not pay his debts, and that the logs had to be moved from the street, and that he was unable to manufacture at present. Miller testifies, that Stein did not tell him he could not pay his debts; that he had no conversation with Stein about his solvency; and that, at the time he purchased the logs, he had not heard that Stein had failed to meet any of his payments. One Jones was in the room with Stein and Miller, when Miller had the conversation with Stein. He was invited by Miller to go with him to Stein's place, and says he thinks that Miller told him, when so inviting him, that Stein had sent to him, Miller, to buy some logs. Jones testifies, that he did not hear Stein say to Miller that he, Stein, could not pay his debts and that he was unable to manufacture at present and that that was the reason why he wanted to sell the logs.

The price which Miller was to pay for the

logs was $45 per 1,000 feet. There is testimony as to whether this was as high as the market value at the time, and there is also testimony that Stein had been notified by the police to have the logs removed from the street. In the view I take of the case it is unnecessary to discuss this evidence.

It is quite clear, on the testimony, that the sale to Miller was not made in the usual and ordinary course of business of Stein, as such course was known to Miller. This fact is, therefore, prima facie evidence of fraud, and throws on Miller the burden of showing that there was no violation of section 5129 of the Revised Statutes. This he has not shown. On the contrary, a case is made out by the plaintiff which falls within the decision in Walbrun v. Babbitt, 16 Wall. [83 U. S.] 577. In that case, a stock of merchandise was sold by the bankrupt, Mendelson, to one Summerfield, and by the latter to the defendants. The assignee in bankruptcy sued the defendants to recover the value of the property. The bankrupt, who was a retail merchant, wrote to Summerfield to bring some money and buy him out. Summerfield went with the money. The bankrupt told him he wished to sell his stock, because he could not succeed in the business in which he was engaged and wished to deal in other kinds of goods. A sale was made at a reduction of 25 per cent. from cost, and Summerfield paid the money to the bankrupt. Summerfield then resold the stock of goods, at a slight advance, to the defendants, who received them from the possession of the bankrupt and paid Summerfield the agreed price for them. The money which the bankrupt received from Summerfield did not reach his creditors and it was alleged by him that he had lost it. The court held, that the plaintiff was entitled to recover; that the transaction of the bankrupt with Summerfield was out of the ordinary mode of transacting the business of the bankrupt, and was prima facie evidence of fraud, and threw the burden of proof on the purchaser, to sustain the validity of his purchase; that the legal presumption that the bankrupt intended to commit a fraud on his creditors was not overthrown by showing that Summerfield paid full value for the goods, in ignorance of the condition of the bankrupt's affairs; that Summerfield, in purchasing in the way and under the circumstances he did, was told by the law that a fraud of some kind was intended by the bankrupt, and was put on inquiry to ascertain the true condition of the bankrupt's business; that he did not do that, nor make any attempt in that direction; that he contented himself with limiting his inquiries to the object the bankrupt had in selling out and to his future purposes; that something more was required than that information, to repel the presumption of fraud which the law raised, in the mere fact of a retail merchant selling out his entire stock of goods; that the presumption of fraud, arising from the unusual nature of the case, could only be overcome by proof on the part of the

buyer that he took the proper steps to find out the pecuniary condition of the seller; that all reasonable means, pursued in good faith, must be used for such purposes; that. if Summerfield had employed any means at all, directed to that end, he would have discovered the actual insolvency of the bankrupt; and that, in choosing to remain ignorant of what the necessities of his case required him to know, he took the risk of the impeachment of the transaction by the assignee in bankruptcy, in case the bankrupt should, within the time limited in the statute, be declared a bankrupt. The court further held, that the defendants were in no better condition than Summerfield would have been if he had not transferred the stock to them, because they, on the evidence, took his title with full knowledge of its infirmity.

In the present case, Stein was insolvent and knew that he was insolvent. He had past due debts that were unpaid, and knew that, by the sale to Miller, he was placing the logs where his creditors could not reach them. He received no money for them and contracted to receive nothing but the personal credit of Miller. It was unusual for him to sell logs as logs, except a single one occasionally for a special object. He owed debts not yet due, as shown by the outstanding note to Hoyt, and, by selling the logs on credit, he was putting it in the power of Miller, by becoming the assignee of the Hoyt note, to practically secure the payment in full of so much of that note as should be equal to the sale price of the logs, to the prejudice of other creditors. It must, therefore, be held, that, in the sense of section 5130, Stein intended "fraud," that is, intended to prevent the property which he sold to Miller from remaining in a position where, in case he should go into bankruptcy, it would come to the hands of his assignee in bankruptcy.

As to Miller, there was sufficient to put him on inquiry, to ascertain the condition of the affairs of Stein, when Stein, a buyer of logs and a chair-maker, was sending to him, Miller, to come and see him, and was offering to sell him a quantity of logs which. so far as appears, were all the logs Stein had, and which Miller could easily have ascertained to have been only recently purchased by Stein. Miller himself testifies, that Stein sent word by somebody, that he wished to see him "in connection with the logs." Miller is pressed by the importance of giving a reason why Stein should be selling logs, and states that Stein told him that the logs were for sale and that he had been notified by the authorities to remove them, the logs being in the street in front of the factory. But, Miller assigns no reason why the logs need have been sold, or why they could not have been removed to Stein's premises, and does not state that he made any inquiry on that point. or as to how Stein could expect to continue

his business without black walnut logs. Miller says that he was to remove the logs immediately and that he did remove them the next morning; that nothing was said as to how he was to pay for them, but he supposed it was to be in the usual time, four months; and that Stein told him that the logs cost more than he, Miller, had offered for them. In view of these undisputed facts, testified to by Miller, which raise the presumption of fraud, because of the unusual nature of the sale, Miller is bound to give proof that he took steps to find out the pecuniary condition of Stein. He gives no such proof. He chose to remain ignorant of what the necessities of the case required him to ascertain, and what he had the ready means of ascertaining. All this arises from the testimony of Miller himself, irrespective of the testimony of Stein.

Miller removed the logs on the 10th. On that same day he took an assignment of the Hoyt note. He did that under very extraordinary circumstances, according to his own testimony. When the note was first shown to him, on his examination as a witness, he stated that he got it from William G. Shand, as a business transaction; and that he simply bought it the same as he bought other paper. He was then asked what was the consideration for the assignment of the note to him, and, on the advice of his counsel, he declined to answer the question. The court having ruled that there was nothing to justify him in such refusal, he answered, "Nothing." The transfer of the note was signed by Shand as attorney for Hoyt, and Miller's transaction was with Shand acting for Hoyt. Miller testifies: "I don't remember the place where the transfer took place. It took place in New York, but where I am not sure. I don't remember whether in a house or on a street. Mr. Shand delivered me the note. I don't remember whether I had any conversation with him or not, nor do I remember how I came to meet Mr. Shand." Subsequently to giving that testimony, he says, that he had an agreement with Shand, that they should meet at some time in the future and settle the terms respecting the consideration for the assignment of the note. Then followed this evidence by Miller: "Q. What was said at that interview? A. The exact words I do not remember. The understanding was, that at some future time I was to pay. Q. Shand had the note with him at the time? A. I believe he had; I won't be positive. Q. Had you had a talk previously to this interview with Shand, about the assignment of this note? A. I don't remember. Q. Can you remember a single word that was said between you and Shand at the time of this interview when the note was assigned? A. I could not swear to any particular word that I uttered; we were talking about the note and that business. Q. Have you since met Mr. Hoyt or any person for him and arranged the terms of the transfer of this note? A. I have not. Q. Have you had any conversation with Mr. Hoyt or any person for him, relative to the terms of the transfer or consideration of said note, since the interview spoken of? A. Not that I recollect. Q. The terms have never been agreed upon, then, between you and Mr. Hoyt, as to the consideration for the assignment? A. I have had nothing to do with Mr. Hoyt. Q. Or any one representing him? A. No, sir. Q. Do you wish to be understood that the matter of the consideration for the assignment of the note still remains open between you and Hoyt? A. It is still open between Shand and I."

Shand, who had charge of Hoyt's business, testifies, that he wrote the assignment on the note on the 10th of December; that he sought Miller in regard to the transfer of the note; and that Miller paid nothing as the consideration for its transfer. Then he testifies thus: "Q. Did you or not have an understanding with the defendant that the consideration for the assignment of said note could be paid from the proceeds of the logs in question, or any other agreement of that character? A. Yes, sir." Then he says that the transfer of the note took place in the street, he and Miller meeting in the street, and the assignment being then on the back of the note. Then he gives this testimony: "Q. What agreement or understanding did you have with Miller as to the consideration for the assignment of the note? A. The agreement was that he, Miller, was to purchase the note, and on a future occasion we would meet and arrange terms." Subsequently he says: "At the time of the meeting with Miller, when I delivered the note, the note was endorsed by me, but it did not have the assignment on it. Mr. Miller said, you had better put the assignment on it, and I took the note and wrote the assignment, and afterwards on that day gave it to Miller."

This is a very strange proceeding. Miller buys of Stein 67 logs, for $1,057.19, which he is to pay for in four months, and the next day receives the logs, and immediately becomes the purchaser from Hoyt of a note made by Stein for $2,242.59, without anything being said as to what he was to pay to Hoyt for the note, except that the terms were to be arranged at a future day. Then Miller proves a claim against the estate of Stein for the difference between the $2,242.59 and the $1,057.19, and thus gets the logs without paying anything for them, and gets a claim besides against Stein's estate, for such difference, namely $1,185.40, without paying anything for it, and without being under any legal obligation to pay anything for it. This is his own story. If this is the result it is not unreasonable to infer that this result was intended by Miller from the beginning, and thus his transaction with Hoyt through Shand throws light on his transaction with Stein.

On the hearing, it was argued that the defendant had a defence to the plaintiff's claim, in the fact that, under section 5073 of the Revised Statutes, the defendant, being the owner of the note for $2,242.59 made by Stein, by the purchase of it before the petition in bankruptcy was filed, had a right to have his debt of $1,057.19 to the estate paid by deducting it from the $2,242.59. But, the difficulty in this view is, that the plaintiff makes no claim for the $1,057.19. He does not claim to recover the purchase price of the logs. He does not affirm the sale of the logs made by Stein but seeks to avoid it. He asks that the sale be held void, and that Miller account for the balance of the property. There must be a decree to that effect.

The point is not taken in the answer, that the plaintiff should have proceeded by a suit at law and not in equity, and it is, therefore, waived. But, if had been taken, it would not have prevailed. Where a transfer of property is made, which is held void under the provisions of the bankruptcy act, as against the assignee in bankruptcy, the transferee, is properly to be regarded as a trustee for the plaintiff, and to be held to account as such, especially where, as in this case, it appears that some, if not all, of the property, has passed away from the transferee. Matters of trust are of equitable cognizance. The case of Traders' Bank v. Campbell, 14 Wall. [81 U. S.] 87, is analogous to the present case, in that respect. See, also, Verselius v. Verselius [Case No. 16,-925].

The fact that Miller has proved a claim for the $1,185.40, and has received a dividend on it, is of no importance. This suit is not brought to set aside the transfer of the note for $2.242.59 to Miller, nor could the plaintiff set aside such transfer, nor, if he could, could he do so without making Hoyt a party to a suit for that purpose. The proof of debt made by Miller is made on the note, though not for its full amount, and Miller is the legal holder of the note.

Let a decree be entered for the plaintiff, with costs.

[For a subsequent proceeding in this litigation, see Case No. 13,352.]